Timothy Jay SMITH, Plaintiff,

v.

**RELIANCE STANDARD LIFE INSUR-
ANCE COMPANY, a Pennsylvania
corporation, Defendant.**

No. CIV.A.01F17179MJW.

United States District Court,
D. Colorado.

June 16, 2004.

James L. Noel, James L. Noel, Atty at Law, Michael S. Krieger, Krieger, Hale & Mulcahy, Englewood, CO, Chrisilda R. Noel, Chris R. Noel, Atty at Law, Boulder, CO, for Plaintiff.

C. Michael Montgomery, David W. Krivit, Lori Kathryn Bell, Montgomery, Kolodny, Amatuzio & Dusbabek, LLP, Denver, CO, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FIGA, District Judge.

## I. BACKGROUND

This is a case arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff Timothy J. Smith was employed as a Senior Consultant from 1991 to 1995 by International Centers for Telecommunication Technology ("ICTT"). ICTT has been a participant, within the meaning of 29 U.S.C. § 1002(7), of two insurance Plans issued to Applied Computing Devices Inc. ("ACD").

The two Plans, Group Long Term Disability Insurance Plan ( "LTD Plan") and the Group Life Insurance and Accidental Death & Dismemberment Insurance Plan ("GL Plan") were administered by ACD. Reliance issued two insurance policies, respectively named LSC 063316 ("LTD Policy") and GL 14572 ("GL Policy"), to ACD to provide benefits under the respective Plans to employees at ICTT. Defendant Reliance is the named fiduciary and insurer and decides claims and appeals for benefits under the two policies.

In 1995, the plaintiff developed a syndrome of chronic fevers, malaise and fatigue after being exposed to Type 1 Herpes. The plaintiff's last day at work was June 21, 1995, and on October 26, 1995, he was diagnosed with Chronic Fatigue Syndrome by his physician, Thomas Chisholm. On November 6, 1995, the plaintiff applied to Reliance for benefits under the LTD Policy alleging that he was totally disabled as a result of his Chronic Fatigue Syndrome. To be eligible for a monthly benefit, the "insuring clause" of the LTD Policy requires an insured to "submit satisfactory proof of Total Disability to us." To be considered totally disabled under the LTD Policy, an insured must be unable to "perform the material duties of his/her regular occupation[.]" This provision covers total disability benefits for the *first 60 months* for which benefits are payable. After the benefits have been paid for 60 months, the claimant is considered totally disabled only if the claimant "cannot perform the material duties of any occupation." The LTD Policy defines any occupation as "one that the Insured's education, training or experience will reasonably allow." Smith was awarded benefits for the initial 60-month period.

In May and August of 1996, plaintiff applied for a waiver of paying insurance premiums and for an extension of life Insurance under the GL Policy. To be eligible for the waiver and extension, the applicant must have a "total disability," which GL defines as a "complete inability to engage in any type of work for wage or profit

for which you are suited by education, training or experience." Reliance granted plaintiff a waiver under the GL Policy. In March 1997, plaintiff was awarded SSDI benefits from the Social Security Administration with an onset date of June 20, 1995. Reliance reduced its monthly payments to plaintiff by the base amount of SSDI payments.

On December 18, 2000, the initial 60 month time period ended, as did the applicability of the "totally disabled" definition related to his "regular occupation." As of December 18, 2000, disability payments would only continue if Smith met the applicable definition of "totally disabled," *i.e.*, that he could not perform the material duties of "any occupation." On January 10, 2001, Reliance terminated plaintiff's benefits under both the LTD Policy and the GL Policy. Plaintiff appealed the decision by letter dated March 1, 2001; Reliance denied the appeal and advised plaintiff that he had exhausted his administrative remedies.

On August 30, 2001, plaintiff filed the instant action. Plaintiff's complaint contains five claims, the first two of which seek benefits he is owed under the GL and LTD Plans. He also asserts a third claim for a violation of ERISA relating to the manner in which Reliance denied his benefits. His fourth claim alleges for Reliance's failure to comply with certain fiduciary duties. The fifth claim seeks penalties ($100 per day from March 8, 2001 to June 8, 2001) for Reliance's failure to provide certain requested information in a timely matter pursuant to 29 U.S.C. § 1132(c).

This case, previously assigned to Hon. Wiley Y. Daniel, was transferred to the undersigned judge as part of a general reassignment of cases pursuant to D.C.COLO.LCivR 40.1 on November 3, 2003. A trial to the Court was held on June 7, 2004 to address limited issues outside the administrative record.

## II. WHICH POLICY GOVERNS?

The first issue which this Court is called upon to decide is which of two policies govern the denial of benefits. On December 2, 2002, Judge Daniel denied the defendant's and plaintiff's cross-motions for summary judgment. He ruled that the LTD policy did not confer discretion on the defendant to determine eligibility for benefits or to construe the terms of the disability plan. He therefore applied the *de novo* standard of review instead of an arbitrary and capricious standard, and he found that genuine issues of material fact precluded an entry of summary judgment.

On June 3, 2003 the Judge issued an Order of relief from judgment and vacated the Court's December 3, 2002 Order. Judge Daniel so acted as a result of the defendant contending that its summary judgment motion referenced the incorrect policy, the 1987 LTD policy, rather than the amended policy dated February 12, 1996. This more recent policy states:

> Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

Following this decision, Judge Daniel ruled that both parties should submit modified motions for cross-summary judgement.

In the revised motion, the plaintiff claimed that defendant had not shown that the second (1996) policy was properly executed. Plaintiff, citing *to Pratt v. Petroleum Production Management Employee*

*Savings Plan,* 920 F.2d 651, 661 (10th Cir.1990), claimed that any amendment after the date plaintiff terminated his employment (in this case September 21, 1995) would not apply to plaintiff's claim.

Plaintiff argued that the defendant has provided no persuasive explanation as to why the latter policy should apply to plaintiff, or why the 1987 Policy was provided to plaintiff by Reliance in November 1995 and again in March 1996 when plaintiff requested copies of the applicable policy. Plaintiff, citing to *Grosz–Salomon v. Paul Revere Life Insurance Co.,* 237 F.3d 1154, 1161 (9th Cir.2001), insisted that the defendant must prove that the policy was properly executed.

The court in *Grosz–Salomon* found that the discretionary authority language did not apply because it was not properly integrated into the existing policy, and the insurance company initiated the discretionary authority language without having received a written request from the policyholder/employer. So too, argued plaintiff, it had not been shown that the discretionary authority language was ever requested by the insured/employer in this case. Plaintiff claims that there is no proof that the alleged 1996 policy was accepted by the policyholder prior to plaintiff's termination from employment or prior to ACD's cessation of business on February 29, 1996. This issue was the subject of discovery taken by plaintiff since February 2004.

The 1996 policy, if valid as to Smith, took effect on February 16, 1996, and plaintiff was notified of the change on March 22, 1996. Plaintiff nonetheless maintains that the amendment is ineffective and that *de novo* review is appropriate.

In summary, the plaintiff claims that the 1987 policy was not properly amended, and it applies at all times relevant to the in-stant case, to plaintiff's disability claim, and in any future claims related to plaintiff's disability. Finally, plaintiff claims that defendant's inconsistent application of policy provisions, and its unauthorized augmentation of policy terms demonstrate that Reliance failed to fulfill its fiduciary duty to act solely in the interest of plan participants under ERISA.

At the hearing on May 5, 2004, the Court granted Plaintiff's Motion for Clarification of Judge Daniel's June 3, 2003 Order (Dkt.# 90), holding that the order did not conclusively determine whether the 1996 policy was in effect, or whether the 1987 policy governed plaintiff's claims. Therefore, these issues were tried to the Court on June 7, 2004.

This Court finds that the evidence establishes that the 1987 policy was issued to ACD on April 1, 1987 under policy number LSC 063316 (AR [1] 280). Under it, Indiana Center for Telecommunication Technology, Inc. was identified as an affiliate of ACD to be covered under the policy (AR 283). Subsequently, that entity's name was changed to International Centers for Telecommunication Technology. Smith was employed by that entity and was subject to that policy at the time he stopped working.

On or before February 12, 1996, Reliance Standard purported to issue an amended policy stating the proper name of the affiliate, including an "authority" paragraph granting discretionary authority to Reliance Standard as to claims determinations and modifying the disability definition for claimants disabled for more than five years (Trial Exhibit 16). The amended policy was sent to Sandra McBroom of ICTT and to ACD's insurance agent, James Anderson (Trial Exhibit 16). Re-

---

**1.** Citations to the Administrative Record filed with this court are indicated by "AR." The administrative record consists of five binders, pp. 1 through 1684.

vised certificate booklets were sent that month to ACD, as well.

Here, however, Reliance points to no authority it had to unilaterally amend the policy. It asserts that the 1987 policy contains a provision stating that "to be valid any change or waiver must be in writing, signed by either our President, a Vice President or a Secretary. The change or waiver must also be attached to this policy." It is true that such language appears in the 1987 policy (AR 286). However, while this language specifies who may be authorized on behalf of Reliance Standard to assent to a change, it does not provide unilateral authority to change a contract of insurance between parties. Reliance presented no written amendment agreed to by the parties to the contract. Its representative who testified at trial pointed out that no one on behalf of the policyholder or plan administrator raised any objections to the amendment as issued by Reliance. However, there was also no evidence that either assented. No evidence was adduced to establish that such actions by Reliance properly amended either the LTD Plan, the LTD Policy or the GL Policy. Uncontroverted testimony from Michael Haley and Rick Brewster of ACD and Sandra McBroom of ICTT, a partially owned subsidiary of ACD, state that no policy changes were authorized by ACD for it or for the benefit of ICTT employees through February 29, 1996, the date ACD shut down under the terms of its bankruptcy petition.[2] The policyholder, ACD, was in bankruptcy at the time the 1996 policy was reissued on February 12, 1996. Nothing indicates that the bankruptcy court or the trustee in bankruptcy authorized such an amendment.

Thus, under the circumstances, the purported unilateral amendment to the disability policy, purporting to grant discretion to Reliance Standard, was not effective as to Plaintiff Smith in the absence of evidence that the employer agreed to the change. *See Grosz–Salomon v. Paul Revere Life Insurance Co., supra,* 237 F.3d at 1157, 1161–62; *Mueller v. CNA Group Life Assurance Co.,* 2004 WL 1161173, at * 6 (N.D.Cal. May 24, 2004); *Cirulis v. UNUM. Corp.,* 321 F.3d 1010, 1014 (10th Cir.2003). Plaintiff's other arguments directed against the validity of the 1996 policy as to him, including notice and summary plan description issues, need not be addressed.

## III. DOES IT MATTER WHICH POLICY GOVERNS?

█ Ultimately, although the parties have vigorously argued over whether it is the provisions of the 1987 policy or the 1996 policy which apply, the differing standard will have no effect on the outcome. If the 1987 policy is the operative one, its terms and the decisions of Reliance Standard as a fiduciary are reviewed under a *de novo* standard given absence of discretionary authority accorded Reliance to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) and *Nance v. Sun Life Assur. Co. of Canada,* 294 F.3d 1263, 1266 (10th Cir.2002). In applying *de novo* review, the Court gives the language of the policy at issue its common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean. *Chiles v. Ceridian Corp.,* 95 F.3d 1505,

**2.** The testimony of these witnesses was presented through deposition transcripts received at the trial but not read into the record. In the deposition, each witness confirms the accuracy of statements made by the witness in a written affidavit. The affidavits were received into evidence at the trial as exhibits 1, 2 and 3.

1511 (10th Cir.1996) (quoting *Blair v. Metropolitan Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir.1992)).

As previously noted, under the 1987 policy, to be eligible for long-term disability benefits, an insured such as Smith had to "submit satisfactory proof of Total Disability to us." Total disability is defined as the inability to "perform the material duties of his/her regular occupation[.]" After 60 months of benefits, Smith remained eligible for such benefits under the 1987 policy if he could not "perform the material duties of *any* occupation." (Emphasis added.) The definition of "any occupation" is "one that the Insured's education, training or experience will reasonably allow."

Under the 1996 policy, after the first 60 months, Smith as an insured would also be Totally Disabled if he "cannot perform the material duties of any occupation," and the term "any occupation" is similarly defined as in the 1987 policy. However, the 1996 policy goes on to state the insured is considered Totally Disabled "if due to an injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis." This revised definition favors a claimant seeking disability status, given its acknowledgment that an insured remains totally disabled even if he or she can perform only limited material duties of an eligible occupation.

■ Balanced against this more liberal definition of "Total Disability" or "Totally Disabled" under the 1996 policy is the discretion it reposes in defendant, absent in the 1987 policy as quoted above. Under the Tenth Circuit's recent *per curiam* decision in *Fought v. UNUM Life Ins. Co. of America*, 357 F.3d 1173, 1180 (10th Cir. 2004), Reliance's decisions are to be reviewed under an "arbitrary and capricious" standard if this language of discretion is operative. However, even if that were the

case, Reliance, as both the claims review fiduciary and the insurer, has a conflict of interest as recognized in *Fought*. *Id.* at 1183. Its conflict causes the Court to go from the "first tier" of analysis, in which the plan administrator "bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard," to the second analytical tier, by which the Court "must determine whether the conflict of interest at issue is so severe as to warrant an additional reduction in deference." *Id.* at 1182. This appears to be a case such that Reliance's decision to deny long term disability benefits "require[s] support ... by a preponderance of the evidence, rather than the traditional requirement of substantial evidence. Preponderance of the evidence presents a higher standard of proof than substantial evidence." *Id.* at 1184 (citations omitted).

There may be an analytical difference between *de novo* review of a fiduciary's decision using the more restrictive definition of "Total Disability" under the 1987 policy and applying an arbitrary and capricious review standard leaning towards the less deferential side of the "sliding scale" of that standard in considering the broader definition of "Total Disability" in the 1996 policy. If so, and the Court cannot discern any, it is a distinction without a difference in resolving whether benefits to Smith were wrongfully denied.

## IV. *DE NOVO* REVIEW OF DISABILITY DENIAL

As indicated above, the 1987 disability policy (and for that matter, the 1996 policy) provided that an insured, once found disabled, would be eligible for disability for a period of 60 months so long as that person was disabled from engaging in his "regular occupation," but the insured would continue to be eligible thereafter

only if he was unable to perform the material duties of "any occupation." Reliance's internal documents refer to this elapse of time and the application of a different standard as a "change in definition." Since plaintiff was first awarded benefits in December 1995, the initial 60 month period elapsed in December 2000, and under the "change in definition," Reliance began a review of plaintiff's case to determine his eligibility under the different definition.

### A. The Medical Evidence

The administrative record reflects that plaintiff was examined by an independent medical examiner, Dr. William S. Shaw, in April 2000. Following the examination, Dr. Shaw issued a twenty-page report, dated June 1, 2000, reporting plaintiff's subjective complaints, his medical history, information and diagnoses from other treating physicians, treating recommendations, and conclusions as to plaintiff's "functional status and employability." (AR 856–875) Dr. Shaw concluded that plaintiff met the requirement for chronic fatigue syndrome but that "employability is not probably precluded based on the objective findings present in (plaintiff's) condition, though limitations do exist. He has the capacity to function at a sedentary occupation with general accommodations...." (AR 874) In further support of this conclusion, Dr. Shaw observed:

> Given these generalizations, this man's individual potential for return to work is significantly greater than average. The patient appears to function at a higher than average intellectual level. Though his functioning may be diminished from his pre-illness status, his capacity is still judged to be substantially greater than average. He has demonstrated an ability to analyze and organize his thoughts in a cogent fashion. His response to my Clinical Evaluation Questionnaire as well as his post evaluation letter documents a good level of higher executive functioning. Likewise, his professional experience in a sedentary job activity should allow some functional gainful employment. (AR 874)

It should be noted that Dr. Shaw's report states that prior to the interview and evaluation, plaintiff filled out a lengthy questionnaire and supplemented it with a 35–page typewritten supplement (AR 856).

Notwithstanding his conclusions, Dr. Shaw also observed in his discussion of plaintiff's symptoms, that "though dysthymia[3] and cognitive dysfunction may be part of the Chronic Fatigue Syndrome, in my opinion, psychologic status has not been adequately addressed. With persistence of symptoms and disability for five years, additional evaluation of this aspect of his condition is strongly advised." (AR 872)

Either in response to this comment of Dr. Shaw, or perhaps merely as a matter of follow-up, plaintiff underwent a neuropsychological evaluation by Dr. Dennis Helffenstein in June 2000. A copy of his report dated July 6, 2000 appears in the administrative record at AR 938–948.

Thereafter, apparently in response to Dr. Shaw's comments about "additional evaluation," Reliance submitted Dr. Shaw's report, at least the results of the neuropsychological evaluation tests performed by Dr. Helffenstein, and some information

---

**3.** Dysthymia is defined as a "type of depression involving long-term, chronic symptoms that do not disable you, but keep you from functioning at full steam or from feeling good. Dysthymia is a less severe type of depression than what is considered a major depression. However, people with dysthymia may also sometimes experience major depressive episodes." Online Medical Dictionary, http://cancerweb.ncl.ac.uk/cgi-bin/omd?query =dysthymia.

from treating physicians, for an independent review by Dr. Gladys S. Fenichel, M.D., a psychiatrist. In her report dated November 13, 2000, Dr. Fenichel concluded that:

> The neuropsychological test report does not document deficits that would preclude Mr. Smith from returning to work. The neuropsychological test report demonstrates that Mr. Smith does not experience significant emotional distress in regard to his reported deficits. The medical records, including reports from treating doctors, Dr. Shaw and neuropsych testing, indicate that Mr. Smith is not motivated to return to work or to seek an accommodation to the problems that are viewed as a consequence of the condition of chronic fatigue .... The neuropsych test results do not document an impairment that would restrict him from working. (AR 953)

## B. *The Denial of Benefits*

In a letter dated January 10, 2001, Reliance advised plaintiff that he was no longer entitled to disability benefits under the policy. (AR 981) The denial letter recites that the company "considered all documentation on file including updated medical records from attending physicians, Dr. James Jones, Dr. Thomas Chisholm, and Dr. Ralph Round. The records provided revealed that your current conditions include chronic fatigue syndrome, disordered sleep, possible early Parkinson's disease, and cognitive function abnormalities." (AR 981)

The letter then quotes extensively from the June 2000 report of Dr. Shaw and the November 2000 letter of Dr. Fenichel. It is not clear from the letter whether Reliance had been provided with a copy of Dr. Helffenstein's report of July 2000, but the letter does quote some of the test findings from his neuropsychological tests as contained in Dr. Fenichel's letter (*see* AR 982). The January 2001 letter concludes that "it was determined that you are capable of performing sedentary level work activity with general accommodations and that the extent of any cognitive deficiencies incurred would not preclude you from returning to gainful employment." (AR 982) The letter lists various occupations which the vocational staff of Reliance "determined" plaintiff could perform. The letter summarizes by stating: "Given these facts, we have determined that you no longer meet your policy's definition of Total Disability and your claim must be closed." (AR 982) The definition of "total disability" quoted at the outset of the letter is the definition contained in the 1987 policy (*see* AR 981).

## C. *Plaintiff's Appeal of the Denial*

Plaintiff timely appealed the denial of benefits (AR 989, 993). With the assistance of counsel, plaintiff obtained and provided additional medical support to Reliance, some of which will be discussed below (*see, e.g.,* AR 1485–88). Reliance apparently submitted the additional material for further review by Dr. Fenichel, who responded to Reliance by letter dated May 30, 2001 (AR 1667–1669).

By letter dated June 8, 2001, Reliance affirmed its denial of benefits stating "we have completed our review of the claim file and have found that our original decision to terminate benefits was appropriate." (AR 1661) The letter specifically addresses plaintiff's argument that Dr. Fenichel did not have the opportunity to review certain information and states that she has now reviewed the additional information. According to the letter, "this additional information does not change her earlier opinion. Dr. Fenichel has indicated that she is continually impressed by Mr. Smith's intellect, analytic capabilities, organizational skills and writing talent which demonstrate capability to perform work within

his physical restrictions. While there may be some impairment, please be aware that the policy requires inability to perform any occupation." (AR 1662). This last statement is based on what Dr. Fenichel wrote in her letter of May 30, 2001 (AR 1669). The Court notes that the June 2001 letter affirming the denial of benefits quotes the definition of disability as it appears in the 1996 policy, not the 1987 policy (AR 1661). However, this is immaterial to this Court's review of the case as the determination as quoted above does not refer to or rely on the additional language in the 1996 definition regarding inability to perform work on a part-time basis.

### D. *Analysis of the Denial of Benefits*

 Although this Court is directed by the applicable law and the facts of this case to conduct a *de novo* review of the determination by Reliance that benefits are denied, it is not entirely clear what constitutes a *de novo* review. Some cases suggest that under *de novo* review the Court accepts new evidence on the issue of disability, but such an evidentiary hearing is not necessary if the Court finds that there is enough evidence in the administrative record on which to base a decision. *Hall v. Unum,* 300 F.3d 1197, 1202–03 (10th Cir.2002); *Mueller, supra,* 2004 WL 1161173 at * 7 n. 7. This Court finds that *de novo* review in the instant case can be undertaken on the present record. In the context of this case, *de novo* review means that the Court must take a fresh look at all the evidence and decide, based on the medical record, whether the preponderance of the evidence supports the determination that Reliance reached. This Court has concluded that the decision reached is not supported by a preponderance of the evidence.

In its denial letter of January 2001, Reliance placed much weight on the opinions of Drs. Shaw and Fenichel. However, in this Court's view, Dr. Shaw's opinion was expressed in somewhat qualified and equivocal terms. For example, Dr. Shaw opined that a functional capacity evaluation would be useless to determine plaintiff's functional capacity because medical literature "documents that upwards of 25% of individuals with Chronic Fatigue Syndrome remain chronically unemployed." (AR 873) Elsewhere, Dr. Shaw stated that plaintiff's "potential for return to work is significantly greater than average." (AR 874) This begs the question: greater than the average what? While Dr. Shaw states that plaintiff has the capacity to function at a sedentary occupation, he also phrases his conclusion vaguely remarking that plaintiff's employability "is not probably precluded based on the objective finding's present in [plaintiff's condition], though limitations do exist." (AR 874) Dr. Shaw clearly put emphasis on his belief that an employer would be obligated to accommodate plaintiff under the Americans with Disabilities Act.[4] *Id.* The Court believes that Dr. Shaw's uncertainty arises from his candid observation that plaintiff's psychological status had not been adequately addressed and that additional evaluation should be performed (AR 872).

As noted above, such evaluation was performed by Dr. Helffenstein in June 2000 and he issued his report in July 2000. When Dr. Fenichel reviewed the test results, she found no documentation of an impairment that would prevent plaintiff from working (AR 953). However, this Court has taken a closer look at Dr. Helffenstein's report and finds that there are substantial findings in that report that

---

**4.** The Court notes that the policy definition of "any occupation" is based on the insured's

"education, training or experience" and does not include reasonable accommodation.

conclude plaintiff is precluded from working at any occupation.

In addition to reporting the specific test results, Dr. Helffenstein reported his conclusions, opinions and observations of plaintiff's condition based on those results as follows:

> Neuropsychological testing revealed a variety of cognitive deficits, inconsistencies or relative weaknesses most suggestive of executive dysfunction. Specifically, he demonstrated inconsistent sustained attention and concentration abilities. Alternating attention and logical sequencing abilities were in the borderline range. Speed of auditory information processing was inconsistent. Verbal fluency was mildly to moderately impaired and response inhibition was mildly impaired. In addition, he demonstrates several motor deficits suggestive of executive motor dysfunction. Executive dysfunction is common in individuals with the chronic fatigue immune deficiency syndrome diagnosis.

(AR 947)

Dr. Helffenstein concluded as follows with regards to Mr. Smith's vocational potential:

> Clearly, his fatigue and poor restorative sleep would limit his ability to consistently meet the demands of competitive employment. His fatigue is exacerbated by ongoing physical pain and headaches which, in and of themselves, would be a vocational limitation. Mr. Smith's documented cognitive deficits would also negatively impact his vocational functioning. He would be at high risk for making errors due to fluctuating attention and concentration as well as the verbal short-term memory deficit. Mr. Smith also experiences episodes of significant deterioration of functioning when he becomes overly fatigued. When each of these factors is considered together, it is my opinion that Mr. Smith is totally and

permanently disabled from competitive employment. It is my opinion as both a neuropsychologist and vocational expert that he would be unable to successfully maintain substantial gainful work activity.

(AR 947–48)

It appears to this Court that Dr. Fenichel gave no consideration to these neuropsychological observations when she performed her review in November 2000. While she mentions certain test scores, she pays no heed to these observations and conclusions from an examining physician (AR 953). This type of "cherry picking" among the findings of a treating physician raises questions about whether the review was objective or was designed to "substantiate the desired decision to limit benefits." *Lemaire v. Hartford Life and Accident Insurance Co.*, 69 Fed.Appx. 88, 92–93, 2003 WL 21500334, *4 (3d Cir.2003).

The record reflects that Dr. Helffenstein examined plaintiff on at least three different dates in June 2000 (AR 938). Reliance, in turn, when denying plaintiff's claim in January 2001, made no mention of Dr. Helffenstein's observations, relying instead on Dr. Fenichel's characterization of his test results (AR 982). Had the insurer considered and rejected the conclusions and observations of Dr. Helffenstein for some stated reason, this Court might find that such rejection was reasonable. But it appears to the Court that Dr. Helffenstein's observations and conclusions were either overlooked or ignored in January 2001.

However, the situation becomes even pronounced during the appeal of the denial. By letter dated March 21, 2001, plaintiff's counsel submitted to Reliance several follow up medical reports, including one issued by Dr. Helffenstein dated March 12, 2001 (*see* AR 1485). Dr. Helffenstein's March 12, 2001 letter (AR 1493–98) specifi-

cally addresses Dr. Fenichel's November 2000 review of his neuropsychological testing (*see* AR 1495–97). Dr. Helffenstein points out the various misinterpretations and misrepresentations by Dr. Fenichel of his July 2000 report. He explains again the basis for his conclusions as to why Mr. Smith's cognitive deficits impact his employability (AR 1496).

To the credit of Reliance, it took seriously the plaintiff's appeal and forwarded the new medical reports to Dr. Fenichel for further review. As noted above, she did a review and issued her letter of May 30, 2001 (AR 1667–69). However, in that letter Dr. Fenichel makes no substantive response to Dr. Helffenstein's comments about her failure to fully understand his July 2000 report. She merely restates what Dr. Helffenstein wrote (*see* AR 1668, at ¶ 4) and then simply concludes her letter stating "the extensive documents do change the opinions that I wrote in the previous two reports." [5] (AR 1669) Therefore, at no place in the record does Reliance or its consulting physicians provide any reason for disregarding the observations and conclusions of Dr. Helffenstein.

Accordingly, this Court accepts the opinion of Dr. Helffenstein, as it has no reason not to. In so doing, this Court is not stating that a plan or claim administrator is bound to provide an explanation of the reasons rejecting opinions of any physician, a requirement that might run afoul of the Supreme Court's holding in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 n. 4, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("we conclude that ERISA does not support judicial imposition of a treating physician rule, whether labeled 'procedural' or 'substantive.'"). Rather, this Court is applying the teaching of that case: "Plan administrators may not arbitrarily refuse to credit a claimant's reliable

evidence ...." *Nord, supra,* 538 U.S. at 823, 123 S.Ct. 1965.

As is obvious, this Court has read the conclusions of Dr. Helffenstein, and has considered them in light of the other medical evidence of record. The Court notes that two of plaintiff's treating physicians, Dr. Thomas Chisholm and Dr. James F. Jones, also provided voluminous medical records, as well as updated specific medical opinions as to plaintiff's medical condition and the limitations it places on his ability to work (*see* AR 1489 and 1648). The Court finds that Reliance gave those opinions little or no weight, barely mentioning them in the denial letters. While it is true that treating physician opinions are not to be given any special weight in ERISA cases, by the same token, they can not be arbitrarily ignored. *See Nord, supra.*

In summary, the opinions submitted by the plaintiff's treating physicians, the plaintiff's medical records, plus the opinions submitted by examining physician Dr. Helffenstein, support a conclusion of disability. On the other side of the balance is the opinion of Dr. Shaw, who examined plaintiff, and the conclusions of Dr. Fenichel, who reviewed only the "paper record," which together state that plaintiff is not disabled from working in any occupation. In this case, where the record contains competing credible opinions, and the Court is performing a *de novo* review and is not obliged to give deference to the conclusion of the claims administrator, it is this Court's opinion that the plaintiff's position is the more persuasive. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 393–94 (3d Cir.2000).

## CONCLUSION

Based on its *de novo* review of the administrative record in this case, this Court

---

5. Dr. Fenichel had also written a two-page report dated December 1, 2000 (AR 978–79)

but it did not address the report of Dr. Helffenstein.

finds and concludes that the denial of benefits to plaintiff was unsupported and therefore erroneous. Even if this Court were reviewing this case under an arbitrary and capricious standard, it would find an abuse of limited discretion under *Fought* on the part of Reliance for arbitrarily disregarding the opinions of disability offered by physicians treating or evaluating plaintiff. Were this a social security case, this Court might remand this case with directions for further consideration of the record in light of Dr. Helffenstein's report. However, as both parties indicated at trial that they did not seek remand, this Court will enter its findings and conclusion that plaintiff is disabled within the meaning of that term as defined in the 1987 plan.

The Court therefore directs that judgment be entered for plaintiff on his First and Second claims for relief. Defendant is ordered to reinstate pay status to plaintiff under the LTD plan, reinstate waiver of the premium under the GL policy, and to pay back due benefits.

The Court further finds that there is no basis for providing relief on plaintiff's Third or Fourth claims for relief, and those will be dismissed. Finally, the Court finds there was an insufficient showing at trial to provide relief on plaintiff's Fifth claim for relief alleging the improper withholding of documents between March 2001 and June 2001, as the administrative record reveals that plaintiff, or his counsel, was amply able during that period to appeal from the denial of benefits stated in the January 2001 letter.

The Clerk of Court is directed to enter judgment in accordance with these Findings of Fact and Conclusions of Law.