**John A. DeGRADO, Plaintiff,**

v.

**JEFFERSON PILOT FINANCIAL IN-SURANCE COMPANY, a Nebras-ka corporation, Defendant.**

**No. CIV.A.02–F–1533 BNB.**

United States District Court, D. Colorado.

April 27, 2005.

Marilee E. Langhoff, Marilee E. Langhoff, PC, Centennial, CO, Thomas L. Roberts, Roberts, Levin & Patterson, Denver, CO, for Plaintiff.

Catherine Cochrane Crane, Michael S. Beaver, Todd W. Miller, Holland & Hart, LLP, Greenwood Village, CO, for Defendant.

## FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD

FIGA, District Judge.

This is a case arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff John A. DeGrado claims that Defendant Jefferson Pilot Financial Insurance Company violated ERISA when it issued a letter on December 13, 2001 awarding him disability benefits based on a long-term disability policy issued by defendant, but allegedly calculating the amount of his benefits contrary to the terms of the policy.

Plaintiff asks this Court to direct defendant to pay him going forward according to what he claims is the proper application of the policy, to direct defendant to pay a lump-sum amount plus interest on the difference between what has been paid and what should have been paid, and to award him attorneys' fees and costs. Defendant urges this Court to affirm its decision on benefits and to dismiss plaintiff's claim.

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on August 7, 2002 alleging five claims for relief. The First, Second and Third Claims for Relief alleged claims under ERISA for recovery of benefits, breach of fiduciary duty and declaratory judgment, respectively. The Fourth Claim stated a common law claim for breach of contract and the Fifth Claim for bad faith breach of an insurance contract. Plaintiff requested punitive damages.

In September 2002, defendant moved to dismiss the Fourth and Fifth Claims based on ERISA preemption. The motion was extensively briefed, but remained undecided at the time the case was transferred to the undersigned judge in November 2003. After the decision of the Tenth Circuit in *Kidneigh v. UNUM Life Ins. Co. of America*, 345 F.3d 1182, 1185–86 (10th Cir.2003), *cert. denied*, 540 U.S. 1184, 124 S.Ct. 1440, 158 L.Ed.2d 89 (2004), in which the Tenth Circuit expressly held that bad faith claims under Colorado common law are preempted by ERISA, and rejected the holding in *Colligan v. UNUM Life Ins. Co. of America*, 2001 WL 533742 (D.Colo., April 23, 2001), on which plaintiff was relying to avoid preemption, plaintiff confessed the motion to dismiss and withdrew its demand for a jury trial on the state law claims (See Notice of Confession of Defendant's Motions, filed March 25, 2004). The Fourth and Fifth Claims were therefore voluntarily dismissed.

On February 17, 2004, defendant filed a motion for partial summary judgment on the First, Second and Third Claims for Relief. Plaintiff, in response, withdrew the Second and Third claims. Plaintiff's Response in Opposition to Jefferson Pilot's Motion for Summary Judgment ("Plaintiff's Response") filed March 25, 2004, at 1. Accordingly, only the First Claim for Relief remained subject to the Motion for Summary Judgment.

A trial of this case to court was set for August 18–20, 2004, but was vacated at the request of the parties by order entered on July 27, 2004, and a scheduling conference

was set for August 4, 2004. On August 4, 2004, this Court stated in open court that disputed issues of material fact precluded granting defendant's motion for summary judgment, and therefore the motion was denied.

The Court stated, nonetheless, that it did not believe a trial was necessary to decide plaintiff's claim as the determination of his ERISA claim would be made based on a review of the administrative record.[1] Instead of re-scheduling the trial, the Court directed the parties to submit simultaneous briefs on September 4, 2004 containing their final arguments in support of their relative positions. The parties timely filed the final briefs.

At the August 4, 2004 conference plaintiff requested leave to notify the Court, if after receiving defendant's final brief and accompanying affidavits, it needed to take additional deposition testimony from Ruth Hagemann, an anticipated affiant. The Court granted such request. On September 27, 2004, plaintiff notified the Court that it did wish to take additional testimony from Ms. Hagemann, and by Order entered on October 5, 2004 the Court allowed plaintiff to take limited additional testimony. On December 3, 2004, in accordance with the Court's Order, plaintiff designated additional testimony from Ms. Hagemann's deposition, and on December 14, 2004, defendant cross-designated portions of Ms. Hagemann's deposition. Accordingly, this matter is fully briefed and ripe for decision on plaintiff's claim.

## FACTUAL BACKGROUND

Plaintiff was Manager of Strategic Sales at Sloan's Lake Management Corporation, a health maintenance organization, or HMO. He became ill with Crohn's Disease in 1999 and was absent from work from April 1999 through September 1999. In July 1999, plaintiff applied for disability benefits. His claim was denied in September 1999, after he had returned to work. He protested the denial through the Colorado Division of Insurance, and in a letter dated January 25, 2000, the defendant reversed its position and allowed benefits for the period from July 13, 1999 through September 20, 1999, taking into account the 90–day elimination period (AR 100). (The elimination period is the period of time an employee must be out of work before the benefits start.)

According to plaintiff, he returned to work in September 1999 and worked on a part-time basis through December 1999, and then on a full-time basis through November 2000, when he was forced to again cease work due to worsening problems from the Crohn's Disease and "new health problems." There appears to be no dispute that plaintiff has been out of work since November 2000. Defendant, however, disputes whether plaintiff worked fulltime during the entire period between December 1999 and November 2000.

In November 2000, after stopping work, plaintiff filed another claim for disability benefits. The defendant's processing of

---

1. Exhibit B to defendant's Reply in Support of Its Partial Motion for Summary Judgment, filed April 23, 2004, is the "claims file" maintained by defendant in connection with plaintiff's disability claims. Exhibit B consists of three separate loose leaf notebooks, with the pages bates-stamped numbers 1 through 1828. In their respective final briefs, both parties cite to this Exhibit, plaintiff using the designation "CF" before the page number and defendant using the designation "DX" before the page reference. This Court will also refer to the binders, but as these documents are the Administrative Record in this case, the Court will refer to the pages preceded by the designation "AR."

this second claim forms the basis for this lawsuit. Some facts are disputed, but in a nutshell this is apparently what occurred:

In a March 1, 2001 letter (AR 1295–97) defendant denied the claim. It appears that the defendant treated the claim as a "new claim" (as opposed to a "recurrent" claim, as discussed below) stating that it was for a period of disability beginning November 28, 2000, with a 90–day elimination period running through February 26, 2001. The letter appears to conclude that the claim was treated as a "new claim" because "payroll records reflect that [plaintiff was] working a fairly regular schedule up until November 2000 ...." (AR 1296–97). Thus, plaintiff was required to provide medical evidence of a severity of impairment to support a finding of total disability as of November 2000, and the letter concludes his medical records do not support such a finding.

Plaintiff again protested this denial of benefits through the Colorado Division of Insurance. By letter dated April 9, 2001, the defendant denied plaintiff's pro se appeal (AR 1300–02). Plaintiff thereafter retained counsel who submitted a formal appeal, accompanied by additional medical records, by letter dated July 13, 2001 (AR 1106–10). By letter dated August 27, 2001, defendant advised plaintiff that it intended to refer plaintiff for an independent medical examination as one is necessary before the final review (AR 1088). However, while no independent physical examination was actually performed or even scheduled, plaintiff's records were forwarded for review to an independent medical consultant, Dr. Jay Benson, in Hartford Connecticut, on September 14, 2001 (AR 1086–87). In a letter dated October 8, 2001, Dr. Benson advised defendant that plaintiff "has major functional limitations secondary to seronegative arthritis and a fibromyalgia syndrome that includes extreme fatigue and weakness." (AR 1059). After receiving this letter, defendant apparently began to re-evaluate its position regarding plaintiff's claim of disability.

By letter dated December 13, 2001 defendant advised plaintiff that based on his appeal it had reconsidered its prior decision and made a "favorable determination" concerning his disability claim, and has "determined that he is totally disabled and his disability will be considered a recurrent disability ...." (AR 999–1000).

The policy defines a "Recurrent Disability" as "a Disability due to an Injury or Sickness which is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable. A Recurrent Disability will be treated as follows:

1. A Recurrent Disability will be treated as a new period of Disability, and a new Elimination Period must completed before further Monthly Benefits are payable; if the Insured Employee returns to his or her regular occupation on a full-time basis for six months or more.

2. A Recurrent Disability will be treated as part of the prior Disability, if an Insured Employee returns to his or her regular occupation on a full-time basis for less than six months."

(AR 90).

To further explain its rationale, the defendant's letter states: "Since Mr. DeGrado returned to his regular occupation on a full-time basis for less than six months, and because his disability is due to an injury or sickness which is the same as, or related to the cause of his original disability, his disability is considered a recurrent disability and the original claim will be

reopened with consideration of benefits from January 5, 2000 to the current date." (AR 999).

In other words, the defendant found plaintiff disabled under sub-paragraph 2 of the definition of recurrent disability, that is, as part of the prior disability. The letter further advises that plaintiff's benefit will be 66.67% of "his basic monthly earnings, less other sources of income. Based upon the information in our possession, 66.67% of Mr. DeGrado's basic monthly earnings at the date his disability originally began would be equal to $3,750.19." (AR 1000). The letter does not expressly state the date when plaintiff's "disability originally began."

## THE PARTIES' CLAIMS AND DEFENSES

Plaintiff contends that if the claim made in November 2000 had been treated as a "new disability," based on plaintiff's earnings in year 2000, the benefits would be $7,640 per month, or more than twice as much as defendant calculated based on its position that this was a recurrent disability with benefits to be calculated on plaintiff's 1999 earnings. Comparing the December 13, 2001 determination stating that plaintiff had a "recurrent" disability, with the March 1, 2001 treatment of plaintiff's claim as a "new" disability, plaintiff characterizes the December 13, 2001 determination by defendant as "a complete reversal in position, addressing an issue which had not even been appealed" by plaintiff to the insurer. According to plaintiff, the defendant did a comparative calculation of the

benefits that would be due plaintiff if his condition were treated as a "new disability" based on his earnings in 2000, versus the benefits that would be due if plaintiff's condition were treated as a "recurrent" disability tied back to the prior disability recognized for the short period in 1999 and based on his earnings at that time.[2] Plaintiff asserts that because his income increased substantially in 2000, the comparison reflected a cost difference that amounted to more than $2 million in added benefits if the claim were treated as a "new" disability, rather than as a "prior disability." (*see* Plaintiff's Response at 5).

Plaintiff first argues that this Court should conduct a *de novo* review of defendant's determination of benefits under the "deemed denied" doctrine set forth in *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625 (10th Cir.2003).[3] Plaintiff asserts that he protested the March 2001 denial of benefits no later than July 13, 2001, but did not receive a definitive response from defendant until December 13, 2001, more than 120 days later, in violation of the ERISA regulation generally requiring a response within no more than 120 days. *See* 29 C.F.R. § 2560.503–1(h).

Plaintiff further argues that whether his claim is reviewed *de novo* or under an arbitrary and capricious standard which gives some deference to the administrator, the determination is subject to being overturned as unreasonable. Plaintiff argues that the administrative record contains sufficient information demonstrating that he returned to work on a full-time basis for at least a six-month period prior to

---

2. This information was apparently obtained by plaintiff through the discovery deposition taken on January 15, 2004 of Ruth Hagemann, the employee who handled plaintiff's case (*see* Plaintiff's Response at 5).

3. This argument appears primarily in Plaintiff's Response at 9–12. In its Final Summation brief, plaintiff incorporated these arguments (Final Summation at 1).

November 2000, and therefore defendant's determination is not supported by the administrative record (Plaintiff's Final Summation of Evidence and Argument at 4–9).

Plaintiff also argues that even if his disability is treated as a prior disability under the second sub-paragraph of the recurrent disability language, the defendant's calculation of his monthly benefit is inconsistent with the policy language (*id.* at 2–4).

Defendant, in contrast, argues that this case should not be treated as a "deemed denied" case warranting *de novo* review, but rather should be reviewed with some deference given to the administrator under the arbitrary and capricious standard set forth in *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997 (10th Cir.2004), *cert. filed*, Jan. 24, 2005. (Defendant's Summation Brief at 2–3.)

Defendant further argues that it made a reasonable determination that plaintiff did not return to work on a full-time basis for six months in 2000 based on the evidence contained in the administrative record regarding plaintiff's work in 2000, and therefore its determination that plaintiff's disability should be treated under the second sub-paragraph of the policy definition of

recurrent disability is not "arbitrary and capricious." Defendant also argues that it therefore properly calculated the plaintiff's disability benefit pursuant to the policy definition of a "recurrent" disability. Defendant submits that therefore its claim determination should be upheld and plaintiff's case dismissed.

## STANDARD OF REVIEW

In *Gilbertson, supra,* the Tenth Circuit held that when a claims administrator fails to issue a decision before the applicable deadline as required by ERISA, the claim is "deemed denied" as a result of that failure, and the court must review the denial by the claims administrator on a *de novo* basis. *Gilbertson, supra,* 328 F.3d at 631–32.[4]

Defendant responds by citing to *Finley v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 379 F.3d 1168 (10th Cir.2004), in which the court stated that the *Gilbertson* decision was not meant to apply a "hair-trigger rule" so that a denial of benefits after the deadline automatically entitles the administrator's decision to no deference, but rather was intended to announce a substantial compliance rule. 379 F.3d at 1173. Under this analysis, *Gilbertson* recognizes that a fail-

---

**4.** Specifically, the court stated:

The question presented is therefore whether a plan administrator with discretionary authority whose delay in deciding a claim results in its being "deemed denied" is entitled to judicial deference. The issue is of first impression in this circuit. We hold that when substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the district court must review the denial *de novo*, even if the plan administrator has discretionary authority to decide claims.

\* \* \* \* \* \*

Therefore, to be entitled to deferential review, not only must the administrator be

given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion. It follows that where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's "deemed denied" decision is by operation of law rather than the exercise of discretion, and thus falls outside the *Firestone* exception. When the administrator fails to exercise his discretion within the required timeframe, the reviewing court must apply *Firestone's* default *de novo* standard.

328 F.3d at 631–32.

ure to strictly meet certain procedural requirements may be overlooked when the claims administrator substantially complies with the regulations and the "process as a whole fulfills the broader purposes of ERISA and its accompanying regulations." 328 F.3d at 634. One of the broader purposes recognized by the *Gilbertson* decision, and reiterated by the *Finley* case, was that the procedural deadlines should be applied to foster "meaningful dialogue" between the claimant and the administrator in the context of an ongoing good-faith exchange of information between them relating to the claim. *Gilbertson, supra,* 328 F.3d at 635; *Finley, supra,* 379 F.3d at 1173–74.

■ Defendant has demonstrated here, unlike the situation in *Gilbertson* where the administrator was apparently ignoring the claimant's appeal and there had been no "meaningful dialogue" for a period of more than six months, that there was an ongoing exchange of communications between July 13, 2001 and December 13, 2001 regarding plaintiff's medical condition and the possible need for an independent medical examination or further review by an independent doctor in order to make a final decision on plaintiff's appeal. *See* Defendant's Summation Brief at 2–3 and Affidavit of Ruth Hagemann, attached thereto as Exhibit A at ¶¶ 4, 14. Shortly after receiving the final information from plaintiff's doctors on December 10, 2001, the defendant issued its claim determination. Thus, this Court cannot say that the situation here, like that in *Gilbertson,* should be treated as a "deemed denied" situation for the purpose of applying a *de novo* standard of review.

There is no dispute in this case that the policy gives discretion to defendant to determine eligibility for benefits and construe the terms of the plan (*see* AR 76). Therefore, this Court must apply the so-called "arbitrary and capricious" standard of review. *Fought, supra,* 379 F.3d at 1003. There is also no dispute here that the defendant had a conflict of interest in that it is both the claims administrator and the insurer. In such situations, a less deferential standard applies. As articulated in *Fought:*

> Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. *See* Kennedy, *Judicial Standard,* 50 AM. U.L.REV. at 1174. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

379 F.3d at 1006.

Accordingly, the appropriate standard of review to be applied to the defendant's determination here is the "arbitrary and capricious" standard of review, as articulated in *Fought, supra,* providing for the reduced deference as described therein due to defendant's admitted conflict of interest, and the possible procedural irregularity articulated by plaintiff in the manner in which his benefits were calculated. According to *Fought* this is a case where "the district court is required to slide along the [arbitrary and capricious] scale considerably and an additional reduction in defer-

ence is appropriate." 379 F.3d at 1007. The burden is thus shifted "to the fiduciary to justify the reasonableness of its decision." *Id.* at 1006.

## THE SLIDING SCALE ANALYSIS

### 1. *Whether the Calculation of Benefits was Reasonable*

The Court first considers plaintiff's arguments that the defendant's calculation of monthly benefits even under the second sub-paragraph of the recurrent disability definition is an unreasonable application of the policy terms. At the outset the Court notes that the only document which sets forth how the defendant arrived at its benefits calculation is the December 13, 2001 letter (AR 999–1000).

It appears from the record that defendant determined that plaintiff's impairment in 2000, arising principally from Crohn's Disease, was a recurrent disability as described in the policy because it was the same as, or was related to, the cause of a prior disability for which monthly benefits were payable (AR 90). As the defendant stated in its December 13, 2001 letter, "[w]e subsequently were advised that Mr. DeGrado began missing time from work around January 5, 2000, due to the same diagnosis." (AR 999). The plaintiff does not appear to challenge this portion of the defendant's determination.

Having determined that plaintiff's disability is a recurrent disability, the defendant then had to determine how the recurrent disability is "treated" under the two scenarios listed in the policy (*see* AR 90). The first possibility, described in the first sub-paragraph, provides for treatment of the recurrent disability as a "new period of Disability" and the second possibility, described in the second sub-paragraph, provides for treatment of the recurrent dis-

ability as "part of the prior Disability." (*Id.*). As quoted above, each sub-paragraph contains criteria based on the employee's interim return to work between the two events of disability. In the Court's view, the primary difference between these two possible treatments, as expressed by the policy language, is whether a "new Elimination Period must be completed before further Monthly Benefits are payable." (AR 90).

In this case, the defendant determined that the second sub-paragraph applied, finding that plaintiff returned to work in his regular occupation on a full-time basis for less than six months (AR 999). It is this determination which plaintiff challenges as unreasonable and unsupported by the evidence in the administrative record. This finding will be discussed further.

Nonetheless, having determined that plaintiff had a recurrent disability, and having determined that it should be treated as part of a prior disability as to which there was no new elimination period, the defendant became obligated to pay plaintiff a "Monthly Benefit." The policy provides that "[t]o qualify for a Monthly Benefit, the Insured Employee must earn less than the percentage of Predisability Income specified in the Partial Disability Benefit Section." (AR 90). Neither party argues as to the meaning of this sentence, or whether it was satisfied here, but since plaintiff was apparently earning nothing after he stopped work, he satisfied this requirement

Finally, the recurrent disability section states: "Monthly Benefit payments will be subject to all other terms of this Policy for the Prior Disability." (*Id.*) Deposition testimony provided by defendant's Vice-president of Claims, Thomas Charest, ap-

pears to suggest that this sentence has the effect of stating that the monthly benefits to be paid for any recurrent disability would be the same amount as paid for any prior disability. (*See* Exhibit 9 to Plaintiff's Response at 27–30.) This does not follow from the policy language, as the first sub-paragraph of the recurrent disability definition does not even refer to a "prior disability." Alternatively, Mr. Charest testified that if the recurrent disability is determined to be a "part of the prior disability" under the second sub-paragraph of the recurrent disability definition, the above quoted sentence means the calculation of monthly benefits is the same amount of the monthly benefits for the prior disability (*id.*). This Court cannot agree with this position.

If the policy meant to state that the monthly benefit for a recurrent disability found to be part of a prior disability under the second sub-paragraph would be the same as the benefits paid for the prior disability, it certainly could have used more specific and direct language than the above-quoted sentence. Rather, the Court finds that the above-quoted sentence, coming as it does in a separate paragraph of the recurrent disability provision, means, at most, that the manner of calculating and paying the Monthly Benefit in any recurrent disability case will be performed in accordance with the other calculation and payment provisions of the policy.

The policy elsewhere contains provisions for calculating what it defines as the Total Disability Monthly Benefit (*see* AR 85). Those provisions provide that the amount of the Total Disability Monthly Benefit equals: "the Insured Employee's Basic Monthly Earnings multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus Other Income Benefits." (*Id.*) Under the policy at issue here, the benefit percentage is 66 ⅔% (AR 69).

The policy also defines Basic Monthly Earnings or Predisability Income. This term is defined as: "the Insured Employee's average monthly rate of gross earnings from the Employer, in effect on the determination date. The determination date is the last day worked just prior to the date the Disability begins." (AR 70).

■ Plaintiff suggests that under a proper application of these provisions, plaintiff's monthly benefit should be calculated as of the last day he worked just prior to the date his disability began (Plaintiff's Final Summation at 3). Although plaintiff does not specify that date, it is presumably some date in 2000. Similarly, as noted above, the defendant's December 13, 2001 letter does not expressly state the date on which plaintiff's disability began. The letter does, however, state that the defendant became aware that plaintiff began missing time from work on January 5, 2000; that his disability "is considered a recurrent disability and the original claim will be reopened with consideration of benefits from January 5, 2000 to the current date," and that his "first benefit payment will cover the period of disability from January 5, 2000 to December 5, 2002." (AR 999). The letter also states that plaintiff's earnings during the period January 5, 2000 through November 28, 2000 will be deducted from the payment as "other income benefits." (*Id.*) From these statements, it is reasonable to find that the latest "determination date" of plaintiff's disability was November 28, 2000 and the earliest "determination date" for plaintiff's disability was January 5, 2000.

According to the administrative record, plaintiff's annual salary had been adjusted

in November 1999 to an annual rate of $174,916.41, and this information had been reported to the defendant (AR 904).[5] This annual salary yields a monthly average rate of gross earnings of $14,576.37, an amount which defendant apparently recognized when it performed the comparative calculation of benefits referenced above. (*see* AR 1006). Had the defendant used this monthly salary, rather than the figure set forth in the December 13, 2001 letter, the monthly benefit payable to plaintiff would have been substantially greater.

This Court finds that a reasonable interpretation of the policy requires the defendant to calculate the Total Disability Monthly Benefit payable to plaintiff as a recurrent disability in accordance with the provisions set forth in the policy (AR 70, 85) and to use the date of January 5, 2000 as the date of disability for purposes of determining plaintiff's Basic Monthly Earnings or Predisability Income. What the defendant did here instead is unreasonable, and the Court will not defer to the defendant claim administrator on this calculation.

Even if the defendant's calculation of the Total Disability Monthly Benefit under the recurrent disability provisions were correct, or reasonable under *Fought*, the Court would find the defendant's determination unreasonable on a different ground.

2. *Whether the Determination Under the Recurrent Disability Provision Was Reasonable*

The Court finds that defendant's determination to treat plaintiff's recurrent

disability as "part of the prior Disability," based on its conclusion that plaintiff did not return to his regular occupation on a full-time basis for six months or more, to be unsupported by substantial evidence in the administrative record.

At the outset the Court notes that the defendant's determination letter of December 13, 2001 sets forth its conclusion that plaintiff "returned to his regular occupation on a full-time basis for less than six months," but does not give any indication of what evidence the defendant relied on in reaching this determination. However, attached to defendant's summation brief is an affidavit from defendant's risk consultant, Ruth Hagemann, who authored the determination letter. In her affidavit Ms. Hagemann identifies a variety of documents contained in the administrative record which she asserts she considered in determining whether plaintiff had returned to work on a full-time basis for six months. (*See* Exhibit A to Defendant's Summation Brief, ¶ 7.) Ms. Hagemann states that the identified documents, plus what she describes as plaintiff's "own admissions," corroborated by statements from physicians (apparently contained in the identified documents) led her to determine "that the vast weight of the record evidence supported a finding that [plaintiff] Crohn's-related illness had in fact 'incapacitated' him, and he had been unable to work full time, *i.e.*, 40 hours per week, for a full six-month period during the time he attempted to return to work from September 20, 1999 to November 28, 2000." (*Id.* at ¶ 8.)

Ms. Hagemann further explains in her affidavit that she concluded that the defini-

5. There is only a small amount of information in the administrative record to explain the reason for the substantial increase in plaintiff's earnings in 2000. According to an affidavit from plaintiff, his earnings increase in 2000 was due to sales commissions received for sales efforts made in prior years that "closed" in year 2000. (*See* Exhibit 3 to Plaintiff's Response, Affidavit of DeGrado at ¶ 8.) The policy expressly provides for the inclusion of "commissions" in an employee's "Basic Monthly Earnings." (AR 70.)

tion of the term "full-time," as used in the recurrent disability section of the policy, means 40 hours of work per week, whereas in the Eligibility for Benefits section of the policy, it means 30 hours per week. (*Id.* at ¶ 10.) Ms. Hagemann states that the "30 hour eligibility requirement does not relate to what is considered full-time as it applies to the Recurrent Disability provision." (*Id.*) She seems to state that the 40–hour per week requirement, which she applied to determine the employee's status under the recurrent disability provisions, is based on the "employer's expectations" for the employee's work, and the hours the employee is regularly scheduled to work, which she claims in Mr. DeGrado's case was 40 hours per week based on information provided in the LTD application (*id.*). The affidavit does not cite to any policy language that expressly makes this distinction, nor does it provide a page citation to the application it references.

The Court notes that it has not found in the applicable policy a definition of "full-time" work to mean 40 hours per week as asserted by Ms. Hagemann. The only definition of full-time work found by the Court is one appearing under the section relating to the Partial Disability Monthly Benefit (AR 86) which defines "full-time" as the average number of hours the Insured Employee was regularly scheduled to work, at his or her regular occupation, just prior to the date the elimination period begins (AR 86). It is not clear from any attachment to the policy what number of hours the plaintiff was regularly scheduled to work.

Moreover, notwithstanding Ms. Hagemann's statement that the employer "indicated" on the disability application that plaintiff was regularly scheduled to work eight hours per day, forty hours per week, the insurance application form contained in the administrative record reflects full-time work generally as either 30 hours per week (AR 61) or possibly as much as 36 hours per week (AR 63).[6]

In reaching her determination, Ms. Hagemann rejected what she describes as the "limited evidence" indicating that plaintiff had worked full-time for at least six months (*id.*). She concluded that the employer's time record, which appears as part of the administrative record in this case (AR 945), was unreliable as an indicator of how much plaintiff had worked.

In accordance with the mandate of *Fought, supra,* 379 F.3d at 1006, 1008, this Court takes a "hard look" at the evidence in the administrative record, and concludes that the defendant has not demonstrated that substantial evidence supports the conclusion it reached. The employer's payroll record relating to plaintiff's work hours during the period from November 13, 1999 through January 20, 2001 reflects that plaintiff worked between 72 and 80 hours each two-week period between January 2000 and November 12, 2000, with the exception of two pay periods where he worked 66 and 64 hours (AR 945). For the pay period ending November 25, 2000, the record shows that plaintiff worked 56 hours, and for the subsequent period ending December 9, 2000 only 24 hours. For the next three pay periods plaintiff was recorded at zero hours. This payroll record supports a conclusion that plaintiff did work full-time for most of the year 2000, and also reflects the onset of his illness and inability to work full-time commencing in November 2000.

**6.** The Court states "possibly" 36 hours because the entry appearing at AR 63 is difficult to decipher and may well state *30* hours.

In addition, the administrative record contains plaintiff's Form W–2 for 2000, reflecting that he was paid a gross salary of $181,625.40 in 2000 (AR 943). The administrative record also contains what appears to be the employer's payroll ledger reflecting gross pay paid to plaintiff every two weeks in varying amounts (AR 947). It is legitimate to infer that an employer would not pay the full annual salary on a bi-weekly basis to an employee scheduled for, but who did not perform, full-time work. There is nothing in the record that suggests that plaintiff was deceiving his employer about his work hours. In addition, plaintiff provided an affidavit in this case in which he states that he returned to full-time work in December 1999, and that from December 1999 through November 2000, he averaged a minimum of at least 30 hours per week with a few exceptions due to extreme illness or fatigue. (*See* Affidavit of John DeGrado, Exhibit 3 to Plaintiff's Response, at ¶ 4). He further states: "I can say with certainty that I worked more than six full months' of work days." (*Id.* at ¶ 5.)

Perhaps more telling in this case is what the administrative record does not contain about this issue. There is no evidence that during its administrative review the defendant obtained or attempted to obtain a statement from plaintiff as to whether or not he was working full-time in 2000.[7] Similarly, there does not appear to be any request to plaintiff's supervisor or employer to provide a statement regarding his work hours during the relevant period in 2000.[8]

A failure by a claims administrator to obtain additional information from the claimant's employer was the basis for a reversal of a claims determination in the recent decision in *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759 (10th Cir.2004). There the court stated that "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." 388 F.3d at 773. The Court also emphasized that "[w]hile a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own." 388 F.3d at 774.

---

7. In deposition testimony given by Ms. Hagemann on January 15, 2004, she testified that the claims file contained conflicting information as to whether or not plaintiff returned to work on a full-time basis between December 1999 and November 28, 2000, but that she did not contact plaintiff, or his counsel, for assistance in clarifying the discrepancy (Exhibit 7 to Plaintiff's Response at 271). The Court refers to this version of the Hagemann deposition excerpts, rather than the copy attached as Exhibit 1 to Plaintiff's Final Summation, because the pagination of Exhibit 1 is too difficult to follow.

8. There is an affidavit dated July 5, 2001 in the administrative record from a Mr. Rob Falkenberg, who states he had been plaintiff's supervisor, but only prior to April 1999. It is unclear how this affidavit became part of the administrative record. Apparently, Mr. Falkenberg continued to work with plaintiff through at least July 2000. Mr. Falkenburg states that "[d]uring the period from December of 1999 to July of 2000, [plaintiff] was working fewer hours with easier duties but was able to fully perform his main duties." (AR 466). "He fully performed all the main duties of his occupation although he sometime worked from his house. It was difficult for him to maintain a regular and consistent schedule." *Id.* at 467. This somewhat equivocal statement from a supervisor of plaintiff does not directly support defendant on the full-time work issue.

Rather than obtaining more information from the plaintiff, or from the plaintiff's employer or supervisors, here the claims administrator relied on fragments of documents found in her file that were submitted for entirely different purposes.

Moreover, a review of the twenty documents listed in Ms. Hagemann's affidavit reveal that some twelve of them were dated before March 1, 2001. (*See* Hagemann Affidavit, ¶ 7). Therefore, they were apparently in the defendant's files at the time it first denied plaintiff's claim for a period of disability in 2000. Yet, in its March 1, 2001 letter to plaintiff, the defendant treated that claim as a claim for a new period of disability under the first sub-paragraph of the recurrent disability definition. If the documents identified in Ms. Hagemann's affidavit were indeed supportive of her later determination that plaintiff did not meet the work criteria set forth in sub-paragraph one, the letter of March 1, 2001 should have so reflected. But it did not, thus raising doubt as to why the documents were considered part of the "vast weight of the record evidence" only a few months later when Ms. Hagemann issued her December 13, 2001 determination.

Accordingly, based on the above-described evidence found in, and not found in, the administrative record, the Court finds that defendant has not met its burden of demonstrating substantial evidence to support its determination that plaintiff "returned to his regular occupation on a full-time basis for less than six months . . . ." (AR 999.)

In addition, this Court slides further along the "sliding scale of deference" when it takes into account the apparent irregularity of defendant's undated calculation of comparative benefits using the two differ-ent sub-paragraphs of the recurrent disability provision (AR 1004–07). The Court recognizes that Ms. Hagemann steadfastly denies in her affidavit and testimony that she directed the calculation to be performed, or that she saw the calculation *before* rendering her decision on December 13, 2001, and that in any event she did not rely on it. If the Court believed the contrary were true, it would be hard-pressed to find that defendant properly acted as a fiduciary as it is required to do under ERISA, for such conduct would plainly indicate that the defendant put its own financial interest before that of the insured, in plain contradiction of the above-quoted language from *Gaither*.

On the other hand, the defendant has offered no plausible explanation as to why the claims administrator would prepare such a document if it had already decided that plaintiff's claim would be treated as a recurrent claim under the second sub-paragraph and part of a prior disability. Nor has the claims administrator provided dispositive evidence that the calculation was provided after determination of plaintiff's claim.

There seems to be no dispute that the calculations were run at the request of Ms. Hagemann. (*See* Deposition of Susan Wharton, Exhibit 8 to Plaintiff's Response at 36). Ms. Wharton also testified that she did not know, nor could she determine, the date on which the calculations were run. (*See* Exhibit 2 to Plaintiff's Final Summation at 7–8). Moreover, there is no conclusive evidence that the document was prepared by Ms. Wharton after December 13, 2001, and no explanation as to why it was prepared. Furthermore, notwithstanding Ms. Hagemann's denial of reliance upon the calculations, she may have seen and relied on the calculations as there is a note

in her handwriting that reads "Susan's help Handle as recurrent." (AR 1008.) While defendant's explanation of all this evidence as innocuous could be correct, it behooves a fiduciary to better document the reasons for such ostensibly questionable actions and notations.

Taking all the evidence as a whole, and reducing the deference in accordance with the guidance of *Fought,* this Court concludes that the determination that plaintiff's claim should be treated as a recurrent claim and part of the prior disability is not supported by substantial evidence on the record, and therefore that determination must be set aside as arbitrary and capricious.

**CONCLUSION**

Based on its review of the administrative record in this case, this Court finds and concludes that the calculation of benefits to plaintiff was unsupported by substantial evidence on the record as a whole.

The Court, therefore, directs that judgment be entered for plaintiff on his First Claim for Relief. Defendant is ordered to recalculate the benefits being paid to plaintiff in accordance with this Order, and to pay plaintiff accordingly going forward.

Further, the parties are directed to endeavor to agree on an amount to be paid as a lump sum payment for the difference between the amount paid under the calculation as made by defendant in December 2001, and the amount that would have been paid under the revised calculation as directed by this Order, and advise the Court within 14 days if such calculations have been agreed to. Such calculation should include interest on the difference at the rate of 8% calculated pursuant to C.R.S. § 5–12–102(1)(b) as monies wrongfully withheld. If the parties cannot reach agreement on the lump sum plus interest, they should advise the Court whether there is need for briefing and a further hearing on the issue.

Any motion for attorneys' fees and costs shall be filed within ten days of the entry of this Order.