FILED
United States Court of Appeals
Tenth Circuit

September 25, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CYNTHIA FLANAGAN,

        Plaintiff-Appellant,

v.

METROPOLITAN LIFE
INSURANCE, Metlife Disability,

        Defendant-Appellee,

    and

HOME DEPOT U.S.A., INC.,

        Defendant.

No. 06-5197
(D.C. No. 05-CV-36-JHP-SAJ)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiff Cynthia Flanagan sued Metropolitan Life Insurance Company (MetLife) and Home Depot, U.S.A., Inc. (Home Depot) arising from the denial of disability benefits in alleged violation of the Employee Retirement Income Security Act of 1974, (ERISA), 29 U.S.C. §§ 1101 *et seq*. The district court denied her claim and this appeal followed. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## Background

Ms. Flanagan began working for Home Depot as a decor consultant in early 2001. Her job was classified as "light," Aplt. App. at 342, and required frequent standing and walking, along with the ability to lift, carry, push and/or pull twenty pounds occasionally and ten pounds frequently. Although the record contains conflicting evidence as to whether she hurt her back moving boxes at home or at work, she claimed the injury rendered her disabled as of July 17, 2003. Shortly thereafter, Ms. Flanagan applied for disability benefits under Home Depot's Welfare Benefits Plan (the Plan), which was administered by MetLife, who was also the insurer.[1]

---

[1] In the district court, the parties filed a stipulated motion to seal the record because it contained medical information. The court granted the motion in a minute order dated January 4, 2006. Nevertheless, the court's "Order and Opinion," dated September 5, 2006, which is publicly available, discusses Ms. Flanagan's medical records. The parties never objected to the court's order, nor have they filed a motion to seal the record in this Court. Therefore, we do not deem the appellate record sealed.

The first medical information in the record is a July 21, 2003, letter from Guy Baldwin, D.O., stating that Ms. Flanagan had an appointment in his office that day, and that her "condition caused her absence [from work] from 07/17/03 to 07/28/03." *Id*. at 276. Dr. Baldwin next saw Ms. Flanagan on July 28, 2003, and wrote another letter stating that her "condition caused her absence from 07/28/03 to 08/13/03." *Id*. at 309. The office notes from this visit indicate that he discussed her x-ray and MRI, which showed "mild L-3 L-4 disc degeneration with bulging, but no compression," *id*. at 292, and noted that these "findings [were] not equaling" her subjective complaints of pain. *Id*. His diagnosis was low back pain. Ms. Flanagan saw Dr. Baldwin again on August 13, 2003, and he wrote another letter stating that her "condition caused her absence from 08/13/03 to 08/22/03." *Id*. at 311.

On a referral from Dr. Baldwin, Ms. Flanagan saw Armen Marouk, D.O., on August 22, 2003. Dr. Marouk wrote a two-sentence letter to Dr. Baldwin in which he recommended four weeks of physical therapy and then a follow-up visit. Although there are no office notes from this visit, Dr. Marouk filled out a form stating that she could not work "until seen again 9-5-03." *Id*. at 312.

Ms. Flanagan saw William Mead, a chiropractor, for physical therapy on August 25, 2003. Dr. Mead stated that he was prescribing "Spinal Manipulative Treatment, High Voltage Galvanic Nerve Stimulation, & Ultrasound daily for 2 – 4 wks. Treatment to continue beyond 4 wks on a declining frequency with

improvement." *Id*. at 269. He further reported that Ms. Flanagan was "Temporarily Totally Impaired due to Intervertebral Disk Syndrome. Such impairment may last for 2 – 4 months or longer." *Id*. at 270. Shortly thereafter, he wrote to Dr. Marouk that Ms. Flanagan "has a long history of low back symptoms, most recently aggravated by moving and lifting boxes in her home." *Id*. at 319. He reported that she "tolerated treatment well today and reported subjective improvement." *Id*. "[She] is being treated daily for two weeks . . . [and] is to be re-evaluated by you in two weeks." *Id*.

On September 5, 2003, Dr. Armen Marouk's colleague, John Marouk, D.O., signed a leave-of-absence form indicating that Ms. Flanagan's x-rays and MRI showed a bulging disk and degenerative disk disease. With regard to her prognosis, he wrote that she could not yet return to work because the "pain [was] too severe – still diagnosing." *Id*. at 273. Dr. Mead also signed a statement on September 5, that in addition to administering the above-described treatment, he was "continuing to do diagnostic tests with Dr. Marouk." *Id*. at 277.[2] He listed Ms. Flanagan's subjective complaints as low back pain and leg pain, and he stated that she was still "Temporary Total Impairment." *Id*. at 278.

Based on the information it had received from Ms. Flanagan's doctors, on September 10, 2003, MetLife approved an initial period of disability benefits

---

[2]    No test results of any type, including x-rays or MRIs, were ever submitted to MetLife.

from August 1 to August 25, 2003.[3] At the same time, it requested that she provide detailed medical information to support her claim.

Following a month of treatment by Dr. Mead, Ms. Flanagan returned for a follow-up examination with Dr. John Marouk on September 24, 2003. Dr. Marouk reported his findings in a letter to Dr. Baldwin as follows:

> Cynthia Flanagan was seen in follow-up visit today. As you know she has been having pain and pain syndrome throughout her entire low back. *We did look at her lumbar spine and we were unable to identify a source of nerve root impingement or significant disk disease. I did have her obtain a bone scan looking for a possible stress fracture of the sacrum however the bone stem was completely normal.* I had a long discussion with Cynthia in regards to her back. I have no surgical recommendations for her. *She has a pain and pain syndrome and I do not have a good anatomic explanation for. In my opinion I have no surgical recommendations for her and I have no other treatment options for her.* We did start her on some physical therapy in August, which did help some of her symptoms.
>
> Impression:
>
> > 1. Lumbar pain, etiology unknown.
> > 2. Sacral pain, etiology unknown.
>
> Recommendations:
>
> > 1. I have no treatment recommendations for Cynthia at this point in time. She did undergo some physical therapy in August and unfortunately this has not helped her symptoms.

*Id*. at 313 (emphasis added).

---

[3] The disability plan pays short-term benefits following the fourteenth consecutive day that a claimant is unable to work due to injury or illness. Aplt. App. at 125.

MetLife wrote again to Ms. Flanagan on September 29, 2003, requesting detailed medical information concerning her alleged disability. Among other things, it requested office notes, diagnostic test results, a list of medications, an evaluation of her functional abilities, and a projected return-to-work date. But the only information submitted by Ms. Flanagan were the office notes from her visits to Dr. Baldwin: (1) on September 29, 2003, which indicated there was "nothing to do," *id*. at 292; (2) on October 1, 2003, to have her blood pressure checked; and (3) on October 6, 2003, at which time Dr. Baldwin diagnosed her with a "[l]umbar strain." *Id*. at 293.

On October 10, 2003, a MetLife internal nurse consultant reviewed Ms. Flanagan's file and documentation and concluded that the "[m]edical documentation does not support [her] inability to perform [her] essential job duties." *Id*. at 343. Accordingly, on October 15, 2003, MetLife wrote that she did not qualify for disability benefits beyond August 25, 2003.[4] In addition to reminding her that she could appeal, MetLife noted that "[t]here were no physical therapy notes or sensory and motor exams submitted. No physical exam findings including range of motion, gait and ambulatory status, or results of deep tendon reflex were submitted. There were also no restrictions or limitations noted on any

---

[4]     Ms. Flanagan saw Dr. Baldwin on October 13, 2003, and he wrote another note that said that her "condition caused her absence from 10/13/03 until [no date specified]." Aplt. App. at 323. Under "Limitations/Restrictions" the note said "[s]till under our care no return day yet." *Id*.

of the office notes." *Id*. at 297. Again, MetLife urged her to submit "[p]hysical examination findings, test results, etc. to support [her] inability to perform the duties of [her] job from August 26,2003 to present," along with "[r]estrictions and limitations preventing [her] from performing the duties of [her] job . . . ." *Id*.

The last medical record in the file is a one-page, unsigned evaluation form from Dr. Baldwin dated November 12, 2003, which contains a diagnosis of "severe degenerative joint disease." *Id*. at 324.[5] The boxes that are checked indicate total, permanent disability such that Ms. Flanagan could never bend/twist, squat, crawl, climb a ladder, reach, or drive motorized equipment, and was permanently prevented from lifting anything weighing between 1 to 10 pounds from the floor to her waist. With regard to her hands, the boxes checked state that although she could do "simple grasping," *id*., she was permanently prevented from using either hand for "pushing/pulling or fine manipulation." *Id*. Similarly, with regard to her feet, the boxes checked indicate a permanent restriction from using one or both for "repetitive movements such as pushing/pulling." *Id*.

On further review, MetLife concluded that "the medical evidence that was available for review did not support [her] inability to remain out of work beyond August 25, 2003. The restrictions provided by [her] treating physicians, did not

_____

[5]     This form contains at least two different sets of handwriting and the line requesting the "Health Professionals Signature" is blank. Aplt. App. at 324.

have objective findings that would support such restrictions and limitations. Therefore, the original determination was appropriate." *Id*. at 329.

## The Plan And The Standard Of Review

To receive short-term disability benefits under the Plan, among other things, Ms. Flanagan was required to establish that she was unable to perform the duties of her regular job; to receive long-term disability, she was required to prove that she was unable to perform not only her regular job, but any "gainful occupation for which [she was] reasonably qualified." *Id*. at 127. In either circumstance, MetLife was entitled to "receive certification accompanied by appropriate medical documentation of a disability from [her] attending doctor[s]." *Id*. at 126, 128.

Because the Plan gave MetLife, the administrator, discretionary authority to determine eligibility for benefits, the district court correctly applied an arbitrary and capricious standard of review. *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004). Moreover, in situations such as this where the administrator is also the insurer, MetLife

> must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

*Id*. at 1006 (internal citation omitted).

On appeal, "our review is limited to determining whether [MetLife's] interpretation was reasonable and made in good faith." *Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1213 (10th Cir. 2002).[6]

**Analysis**

Ms. Flanagan argues that the information provided by Drs. Baldwin, Marouk, and Mead, and in particular the November 12, 2003, form purportedly filled out by Dr. Baldwin, is objective proof of her disability. Her argument is that although none of these medical professionals could reconcile her subjective complaints with the scant evidence, their mere statements are objective evidence and nothing more is required.

According to the plain language of the Plan, MetLife was entitled to "receive certification accompanied by appropriate medical documentation of a disability from [her] attending doctor[s]." Aplt. App. at 126, 128. Factually, there is no appropriate clinical evidence to establish a disability. The only testing referenced is an x-ray and MRI, which allegedly showed mild disk degeneration,

---

[6] In her opening brief, Ms. Flanagan states one issue as whether a de novo or arbitrary and capricious standard of review applies to the review of MetLife's decision. It does not appear from the record that this issue was raised in the district court, and in any event, it is not developed in her brief. Therefore, we will not consider it on appeal. *See Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992) (holding that stating that the court erred without advancing reasons why is insufficient appellate argument); *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992) (holding that as a general rule this court will not consider an issue that was not raised below).

but no bulging. Neither Dr. Baldwin nor Dr. Marouk could account for her subjective complaints, and Dr. Marouk confirmed that there was no "root impingement or significant disk disease." *Id*. at 313.

The November 12, 2003, form stated for the first time that she suffered from "severe degenerative joint disease," *id*. at 324, and noted severe permanent restrictions. As provided for in the Plan itself, it was not unreasonable for MetLife ask for something more than a form to support this conclusion. In *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999), we held that a rational plan administrator could reject a doctor's report when there was no accompanying clinical data to support the conclusion. The November 12 report submitted by Ms. Flanagan did not include any supporting data for the conclusions.

The judgment of the district court is AFFIRMED.

Entered for the Court

David M. Ebel
Circuit Judge